## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SCOTT J. MOORE and | ) | |
| SHELLEY S. MOORE, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-0612-KD-M |
| | ) | |
| SETERUS, INC. and FEDERAL | ) | |
| NATIONAL MORTGAGE | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This action is before the Court on Defendants Seterus, Inc. and Federal National Mortgage Association's motion for summary judgment), Plaintiffs Scott J. Moore and Shelley S. Moore's response, and Defendants' reply (docs. 33, 38 and 40). Upon consideration, and for the reasons set forth herein, Defendants' motion for summary judgment is **GRANTED.**

I. Factual and procedural background

The Moores have a business specializing in heating, ventilation and air conditioning installation. In January 2007, they obtained a mortgage loan with Suntrust Mortgage, Inc., in the amount of $180,160.00. Originally, Mortgage Electronic Registration Services, Inc., serviced the loan as nominee for Suntrust. The loan is secured by their home located in Daphne, Alabama. The Moores' still reside on the property and there has been no foreclosure. The 30-year loan required interest-only payments of $994.63 for the first 120 months, then principal and interest payments of $1,356.52 thereafter. The Moores pay their taxes and homeowners' insurance through escrow. In October 2011, MERS assigned all rights and interests to Suntrust.

The terms of the Mortgage, regarding application of monthly payments or proceeds, as

referenced in Seterus' response (doc. 38-18, p. 1, ¶ 4), states as follows:

> 2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. ["Funds for Escrow Items"] Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.
>
> If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

(Doc. 33-1, p. 16) (bracketed text added).

The Mortgage and Note authorize collection of loan installments, late charges, and attorney's fees  (doc. 33-1, p. 9-10, Note; p. 16, 19-20, Mortgage, ¶¶ 1, 9). Paragraph 14 of the Mortgage specifically authorizes charges "for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection fees and valuation fees" (doc. 33-1, p. 22).  Paragraph 14 also states: "In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee." (Id.)

Beginning around May 2011, the Moores started falling behind on their monthly mortgage payments.  At that time, their monthly interest payment was $992.00 and their monthly

2

escrow payment was $466.80[1] (doc. 38-18, p. 6).  When they were paid for engineering work, they attempted to pay Suntrust a lump sum toward the arrearage.  Suntrust refused payment and scheduled a foreclosure for December 29, 2011.[2]  The Moores filed a Chapter 13 Bankruptcy on December 20, 2011.

Subsequently, they began paying the pre-petition amount due to Suntrust through the Bankruptcy Plan and paid their monthly mortgage payments direct to Suntrust.  Shelley Moore testified that they paid - direct to Suntrust - their monthly mortgage payment for January, February, March and May of 2012 (doc. 38-1, p. 7, Moore deposition).[3]  The Moores assert that some of these four payments were never applied to their account (doc. 38, p. 3-4).  The Customer Account Activity Statement indicates that three had been credited before the transfer to Seterus (doc. 38-18, p. 4-5)  As discussed later, the fourth also appears to have been credited to their account (doc. 38-18, p. 4, 9).  Specifically, the Activity Statement indicates that the Moores' May 2011 payment was due at the time of the bankruptcy (doc. 38-18, p. 5).  On January 13, 2012, Suntrust processed the Moores' first post-petition payment. (Id.)  According to the Activity Statement, the payment was placed in "suspense".[4]  On March 8, 2012, Suntrust applied this

---

[1]  The monthly payment fluctuated because the escrow fluctuated. During the relevant time period, the escrow payments ranged between $436.55 and $484.81 (doc. 38-18, p. 4-12).

[2] Suntrust is not a party to this action.

[3]  Shelley Moore testified that they paid these same four payments again through the Bankruptcy Plan (doc. 38-1, p. 7, Moore deposition).  This is not correct.

[4] Seterus' Contested Litigation Officer, James Foster, testified that excess funds were held in suspense accounts until a sufficient amount was available to make a full mortgage payment (Doc. 38-4, p. 4, 7, Foster Depo.). The Moores sometimes made their payment in even amounts such as $1,450.00, $1,500.00 or $1,600.00, which often left a small amount in the suspense account.

payment to the May 2011 unpaid monthly payment [5] (doc. 38-18, p. 5).  At that time the "due date" for the next payment became June 2011 (Id.).  On February 27, 2012, Suntrust processed the Moores' next post-petition payment. The payment was placed in suspense. On March 8, 2012, Suntrust applied this payment to the unpaid June 2011 monthly payment.  The "due date" for the next payment became July 2011 (Id., p. 4).  On March 30, 2012, Suntrust processed the Moores' third post-petition payment.  The payment was placed in suspense. On May 25, 2012, Suntrust applied this payment to the July 2011 unpaid monthly payment (Id.).  The "due date" for the next payment became August 2011.  On May 29, 2012, Suntrust processed their fourth post-petition payment (Id.). The payment was placed in the suspense account (Id.).

On June 1, 2012, while the payment was in suspense, and about six months after the Moores filed bankruptcy, Federal National Mortgage Association (FNMA) acquired the Moores' loan from Suntrust. Also, on June 1, 2012, Seterus acquired servicing rights and began servicing the loan for FNMA (doc. 38-20, Transfer of Servicing Notice).  Seterus had no role in the application or processing of the loan payments before June 2012.  After that date, the Moores were to pay their monthly mortgage payments direct to Seterus and not to Suntrust.  As stated above, at transfer, the Moores had made four direct payments to Suntrust, three of which had been applied to their account for payments due for May, June and July 2011 (doc. 38-18, p. 4-5) and the fourth remained in suspense (Id., p. 4; doc. 38-20, p. 4, Seterus Notice of Transfer: "Funds Held" "Less Suspense Balance: $1,428.57").

On June 8, 2012, Suntrust filed a Proof of Claim in the bankruptcy action (doc. 38-7).

---

[5] At deposition, Foster testified that Suntrust would have applied the January 2012 monthly payment to the May 2011 past-due monthly payment (Doc. 38-4, p. 7, Foster Depo.).

Suntrust identified as $13,405.85[6] as the total amount necessary to cure default as of the petition

date December 20, 2011.  The amount was comprised of eight unpaid monthly payments from

May 1, 2011 through December 1, 2011 totaling $11,357.04 (8 x $1,419.63 per month); pre-

petition fees, expenses, etc., totaling $1,623.81(late charges $427.19, attorney fees $540.00,

advertisement $206.54, title $200.00, property inspection fees $135.00, escrow shortage $109.49,

mail $5.59); and $425.00 for filing the Proof of Claim.

On June 25, 2012, Seterus applied the Moores' fourth payment that had been held in

suspense since May 29, 2012.  The payment was applied to the August 2011 payment and the

"due date" advanced to September 2011 (doc. 38-18, p. 9).  Also, on June 25, 2012, payment was

applied to the September 2011 "due date" (Id.).

On June 27, 2012 and again on July 9, 2012, Seterus sent the Moores a reinstatement

letter (doc. 38-20, p. 5; doc. 38-5).  The letter of July 9, 2012 stated that $11,855.37 was the

"Reinstatement Amount" and it was "Good Through: August 6, 2012" (doc. 38-5).[7]  The

"detailed breakdown of reinstatement" attached to the letter, indicates that the amount was

comprised of unpaid monthly mortgage payment due from October 1, 2011 through July 1, 2012

($9,920.00); other charges for publication ($206.54), legal fees and costs ($540.00, $5.59), title

---

[6]  The Trustee's Final Report and Accounting shows $13,405.85 as FNMA's mortgage arrearage (doc. 38-9).

[7]  The letter also stated: "This communication is from a debt collector as we sometimes act as a debt collector.  We are attempting to collect a debt and any information obtained will be used for that purpose. . However, if you are in bankruptcy or received a bankruptcy discharge of this debt, this letter is not an attempt to collect the debt, but notice of possible enforcement of our lien against the collateral property." (Doc. 38-5, p. 1)  The letter stated that the "reinstatement amount may change due to receipt and/or disbursement from your account prior to receipt of reinstatement in full" and that "Additional charges may be owing for costs and/or services that have been ordered but not yet invoiced."  (Id). The letter instructed the Moores: "Please request an updated reinstatement estimate prior to sending any funds."   The letter twice stated: "… this reinstatement is provided subject to final verification". (Id.).

work ($200.00)[8] and property inspection ($15.00) and for escrow ($968.24).

On August 31, 2012, after the July 2012 demand letter was sent, another payment was processed. The payment was applied to the October 2011 "due date" (doc. 38-18, p. 9).

There were no payments processed again until October 23, 2012, when Suntrust's claim was paid from the Bankruptcy Plan (doc. 38-4, p. 16, Foster Depo.).[9]  The payment of $13,405.85 was deposited into "suspense".  The next day, the funds were applied to the "due dates" of November 2011 through July 2012 – nine monthly payments of $1,476.81, making the next monthly payment due August 2012 (Doc. 38-18, p. 9).  Although the Claim included fees, expenses, attorney's fees and costs, totaling $2,048.81,[10] Seterus applied $13,291.29 of the $13,405.85 to the unpaid nine monthly payments, leaving $114.56. (Id.)[11]  The Activity Statement does not indicate that the fees, expenses, attorney's fees and costs were paid (Id.). And because the payments (interest and escrow) made were applied to the monthly payments, the fees, expenses and attorney fees were still owed.

The Moores allege that they paid twice for May, June, July and August 2011: First, because Suntrust applied their January, February, March and May 2012 post-petition payments to May, June, July and August 2011, and second, by paying the Bankruptcy Claim for pre-petition arrearage, which included May, June, July and August 2011.  However, the Activity

---

[8]  These appear to be the same fees and expenses claimed in the Proof of Claim.

[9]  The Trustee's Final Report and Accounting shows a "$0.00" balance due to Suntrust as of dismissal (doc. 38-9).

[10]  Late charges $427.19, attorney fees $540.00, advertisement (publication) $206.54, title $200.00, property inspection fees $135.00, escrow shortage $109.49, mail $5.59, and $425.00 for attorneys' fees to prepare and file the Proof of Claim, totaling $2,048.81.

[11]  In the reply, Seterus states that the remaining $114.56 "was held in suspense until a full Periodic Payment could be made" (doc. 40, p. 4, n. 3).

Statement indicates that the funds for the Bankruptcy Claim, $13,405.85, was not applied to May, June, July and August of 2011, but instead was applied to November 2011 through July 2012 (doc. 38-18, p. 9). The Moores have not presented any evidence to the contrary.

On March 29, 2013, Seterus and FNMA filed a Motion for Relief from the Automatic Stay on the basis that the Moores had defaulted on their post-petition mortgage payments for the months of January 1, 2013 to March 1, 2013, in the amount of $4,430.43 ($1,476.81 per month) (doc. 38-10, p. 6, Fact Summary). On May 24, 2013, the Bankruptcy Court entered an order conditionally denying the Motion.

The Bankruptcy Court found the total post-petition arrearage had increased through April 1, 2013 to $5,907.24 (4 months) plus attorney fees of $550.00 and filing fees of $176.00, which totaled $6,633.24 (doc. 38-11). The Bankruptcy Court acknowledged that the parties had reached an agreement and "by agreement of the parties", found that the Moores had paid $1,476.81 on April 1, 2013 for the January 2013 payment, paid $2,953.62 on April 10, 2013 for the February and March 2013 payments, and had paid $726.00 for attorney fees and expenses. As ordered, on April 29, 2013, the Moores paid their April payment  (doc. 38-18, p. 9).

Beginning May 1, 2013, the Moores were to resume their regularly monthly payments to Seterus (doc. 38-11). However, the Moores made no payment for May 2013. The Moores began to fall behind again; between May 2013 and March 2015, they fell behind on five payments.

The Moores' Chapter 13 bankruptcy was dismissed on March 20, 2015. They did not obtain a discharge (doc. 33-2, p. 29, Shelley Moore Depo.).[12] Seterus erroneously coded their account as having been discharged.

_____

[12] Shelley Moore testified that they couldn't make the $4,600 monthly payment to the Bankruptcy Plan.

The Moores did not make a payment in March or April 2015, which put them seven payments behind.

On April 7, 2015, Seterus sent the Moores a Notice of Intent to Foreclose letter informing them that they were in default on the loan in the amount of $14,331.71 and payment by May 12, 2015 was necessary to cure the default and avoid acceleration of the loan and foreclosure (doc. 33-1, p. 71- 73).  In part, the April 2015 letter stated as follows:

> If full payment of the default amount is not received by us in the form of a certified check, cashier's check, or money order on or before the Expiration Date, we will accelerate the maturity date of your loan and upon such acceleration the ENTIRE balance of the loan, including principal, accrued interest, and all other sums due thereunder, shall, at once and without further notice, become immediately due and payable.

> Failure to cure the default will result in acceleration of the sums secured by the mortgage and may result in the sale of the premises. If you send only a partial payment, the loan still will be in default. Additionally, we will keep the payment and may accelerate the maturity date.

> IF THE DEFAULT IS NOT CURED ON OR BEFORE THE EXPIRATION DATE, THE LOAN OWNER AND WE INTEND TO ENFORCE THE LOAN OWNER'S RIGHTS AND REMEDIES AND MAY PROCEED WITHOUT FURTHER NOTICE TO COMMENCE FORECLOSURE PROCEEDINGS. FORECLOSURE PROCEEDINGS WILL NOT BE COMMENCED UNLESS AND UNTIL ALLOWED BY APPLICABLE LAW. ADDITIONAL FEES SUCH AS FORECLOSURE COSTS AND LEGAL FEES MAY BE ADDED PURSUANT TO THE TERMS OF THE LOAN DOCUMENTS.

> Nothing contained in this letter or in any other communication regarding the loan shall modify or waive any term or provision of the loan. The status of your loan may be reported to credit reporting agencies.

> You have the right to reinstate your loan after acceleration and the right to bring a court action or assert in the foreclosure proceedings the nonexistence of a default or any other defense to acceleration and sale. If you reinstate your loan after acceleration, the loan no longer will be immediately due in full.

(Doc. 38-12).

Seterus' Contested Litigation Officer James Foster states that the $14,313.71 past due amount included the following: Monthly payments for seven months - October 2014 through April 2015 totaling $10,337.61; "legal, publication, and title fees in the amount of $2,403.13"; property inspection fees of $180.00; and late charges of $1,537.60 (doc. 33-1, p. 5, Foster Affidavit).  The actual amount due at that time was $14,458.40, the total of these items. However, $126.69 from the Moores' suspense account was applied, which left $14,331.71 due (doc. 38-18, p. 2).

The Moores timely paid $14,331.71 in May 2015.  Seterus applied the payment to the October 2014 through June 2015 payments totaling $13,291.29 with the balance of $1,040.42 applied to late charges[13] (doc. 33-1, p. 5-6).  Seterus stated that "[t]hese funds were not applied to satisfy any of the legal fees assessed to the loan that were included in the total amount" of $14,331.71 (doc. 38-18, p. 2, Seterus' response to the Moores' Qualified Written Request/Notice of Servicing Error). At this point, there is no indication that any funds had been applied against the pre-petition fees in the Proof of Claim, the fees for preparing the Proof of Claim, and the "Legal, Publication and Title Fees".   Thus, these fees were still owed.

When the Moores made the payment on May 7, 2015, their May payment had become due May 1, 2015.  Therefore, the payment was applied to the May 2015 payment.  As stated above, Seterus applied part of their lump-sum payment to the forthcoming June 1, 2015 payment.

On June 3, 2015, the Moores sent Seterus their Qualified Written Request/Notice of Servicing Errors wherein they set forth certain errors in the application of the monthly mortgage

---

[13]  The credit for the late fees appears on the payment history as two separate credits of $999.99 and $167.12 totaling $1,167.11.  The $126.69 from the suspense account plus the $1,040.42, totaling $1,167.11, were applied to the late charges.

payments (doc. 38-17). The Moores referenced the letter of April 7, 2015 seeking $14,331.71 for their arrearage.  The Moores stated that they did not receive a monthly statement and therefore had difficulty determining what was owed each month, how their payments were applied, or their balance due, and therefore, had no choice but to pay the amount demanded for fear of foreclosure.

The Moores also stated that the amount Seterus demanded was more than the balance due. In support, they point out that the automated phone system told them that their next payment was not due until July 2015.  They also stated that their mortgage payment was misapplied because there was a discrepancy between the interest paid as shown in their records and the interest reported by Seterus to the IRS.  The Moores set out eight different requests for investigation and correction to their account:

1. A complete payment and transaction history for this loan;

2. A[n] explanation of how the $14,331.71 reinstatement amount listed in your April 7th letter was calculated;

3. An explanation as to why we have never received monthly statements;

4. List of each month that during which you do not believe we failed to make a timely mortgage payment;

5. The date on which you became the servicer of our loan;

6. The total amount, separately listed and identified for any unpaid principal, interest, and other charges due and owing as of today 's date;

7. Identification of the current holder of the mortgage, if you contend you do not hold the mortgage, and the date on which that holder acquired the mortgage;

8. A list of each and every payment you have made from our escrow account, giving the date and amount of each payment. Also explain how our current escrow amount has been calculated.

(Doc. 38-17).

Seterus received the Moores' QWR/NSE on June 8, 2015. Seterus responded by letter mailed June 12, 2015, to acknowledge receipt of the QWR/NSE (doc. 33-1, p. 6, Exhibit 9).

On June 24, 2015, Seterus sent the Moores an escrow statement and a refund check in the amount of $6,256.08 (doc. 1, ¶ 18). This payment was a "surplus refund" from the escrow account (doc. 38-18, p. 13, Escrow Account Statement). [14]

On July 20, 2015, Seterus wrote the Moores that their request was being reviewed. Seterus stated that additional time was needed to complete the investigation (doc. 33-1, p. 6)

On August 6, 2015, Seterus responded to the Moores' QWR/NSE and document requests as follows:

> On behalf of Seterus, Inc., I am responding to your correspondence regarding the above-referenced loan. The loan is wholly owned by Fannie Mae (Federal National Mortgage Association). Fannie Mae has contracted with Seterus to service and respond to inquiries about the loan. As a result, inquiries may be directed to Seterus at our Correspondence address at PO Box 1077, Hartford, CT 06143. Seterus is a loan servicer only.
>
> The servicing of the loan transferred to Seterus from Sun Trust Mortgage on June 1, 2012. At that time, the loan was contractually delinquent for the August 1, 2011 contractual installment in the amount of $1,476:81 ($992.00 for interest and $484.81 for escrow) and all subsequent contractual installments. For your reference, I have enclosed a copy of the prior servicer contractual payment history provided by Sun Trust Mortgage which details when they received funds and how they were applied to the loan.
>
> As you requested, I have also enclosed a copy of the contractual payment history since we began servicing the loan on June 1, 2012 detailing when we received funds and how they were applied to the loan. It is important to note that the

---

[14] The Moores' property tax and hazard insurance was paid from the escrow. In July 2016, the total was $3,786.16 (taxes - $493.16; insurance - $3,293.00) (doc. 38-18, p. 13).

enclosed payment histories detail payments received and applied according to the original terms of the Interest First Note and Mortgage governing the loan.

In your correspondence you indicate that the escrow portion of your monthly contractual installment amount has increased and you have not received an Escrow Account Statement (analysis) regarding the increase. Due to the continued contractual delinquency of the loan, an analysis was not generated until June 24, 2015 (copy enclosed); therefore, your contractual installment amount remained at $1,476.81 ($992.00 for interest and $484.81 for escrow) until the August 1, 2015 contractual installment as detailed in the enclosed analysis.

This analysis details how the monthly contractual installment amount decreased to $1,307.52 beginning with the August 1, 2015 contractual installment. This analysis also determined that surplus funds in the amount of $6,256.06 were available to be refunded to you. An escrow refund in this amount was sent to you on June 24, 2015.

Due to the continued contractual delinquency of the loan, a Notice of Intent to Foreclose was issued to both Scott James Moore and Shelley Simmons Moore on April 7, 2015 (copies enclosed). These notices were issued to you to advise you that failure to cure the contractual delinquency of the loan by May 12, 2015 may result in the initiation of foreclosure action against the loan. The amount detailed in these notices includes any fees that had been assessed to the loan at that time.

On May 7, 2015, we received funds in the amount of $14,331.71 to reinstate the loan to a contractually current status. These funds were combined with the funds of $126.69 in the suspense account to satisfy the October 1, 2014 through June 1, 2015 contractual installments of $1,476.81 each (totaling $13,291.29) and the remaining funds of $1,167.11 satisfied the late fees assessed to the loan. These funds were not applied to satisfy any of the legal fees assessed to the loan that were included in the total amount detailed on the notices issued to you on April 7, 2015. We apologize for any confusion this may have caused.

Based on your request, I have enclosed a copy of the Escrow Principal Balance History detailing credits to and disbursements made from the escrow account since we began servicing the loan through February 28, 2015 for your reference. Any disbursements made from the escrow account since that time will be detailed on the enclosed Seterus payment history.

I have also enclosed the Seterus List Master File detailing charges assessed to the

loan through February 28, 2015. This document also provides information about funds that may have been credited to these fees. Since February 28, 2015, two property inspection fees in the amount of $15.00 each were assessed to the loan on April 15 and May 13, 2015.

Property inspections are ordered when a loan is contractually 45 days delinquent, and every 30 days thereafter if the contractual delinquency continues. These are drive-by inspections and are used to determine if the property is occupied and in good repair in order to protect the loan owner's interest in the collateral property. The fee for this service is billed to Seterus by a third party and is then passed along to you under the terms of the Mortgage governing the loan.

Our records indicate that your Bankruptcy has been discharged. Due to this, we are unable to grant your request to provide you with monthly Account Statements as they may be misconstrued as an attempt to collect a debt that is no longer owed. If you would like to verify the monthly contractual installment information, you may contact us at the telephone number listed above.

In your correspondence you express concern regarding the total amount of interest paid in the 2014 tax year and the total amount of interest reported to the IRS for the 2014 tax year. According to our records, the IRS Form 1098 Mortgage Interest Statement reflects the total amount of interest paid in the 2014 tax year was $9,920.00. A copy of the IRS Form 1098 Mortgage Interest Statement is enclosed for your reference.

(Doc. 38-18, p. 1-3)

The letter also contained this statement:  "This communication is from a debt collector as we sometimes act as a debt collector.  We are attempting to collect a debt and any information obtained will be used for that purpose." (Doc. 38-18, p. 1-3).

In the letter, Seterus referenced a copy of a "Master File" which included a detail of charges assessed to the loan through February 2015.  The document is captioned "Anticipated Fees/Costs Owed" but referred to by the parties as the "Screenshot" (doc. 38-13).  The following fees and expenses are listed:  $550.00, $100.00, and $176.00 for voucher "lega12780106…8", due August 8, 2013; $425.00 and $200.00 for voucher "lega8774556…7", due September 5,

2012; $5.59 for "lega", $206.54 for "publ", $360.00 "lega", due May 7, 2012, and $200.00 "titl",

and $180.00 "lega", due November 22, 2011.  The Screenshot indicates that none of these have

been paid.

Unable to resolve their dispute, the Moores filed their complaint against Defendants on

December 1, 2015 (doc. 1).  They allege that Defendants FNMA and Seterus breached the

Mortgage and Note by failing to apply payments tendered by the Moores in accordance with the

terms therein, by demanding sums not owed, and by violating an implied duty of good faith and

fair dealing (Count I).  The Moores also allege that Defendant Seterus violated certain provisions

of the Real Estate Settlement Procedures Act (RESPA) regarding the actions a loan servicer such

as Seterus must take upon receipt of a Qualified Written Request and Notice of Servicing Errors

(Count II) and that Defendant Seterus violated certain provisions of the Fair Debt Collection

Practices Act (FDCPA) while attempting to collect a debt, communicating information about the

debt, and threatening to take a non-judicial foreclosure action (Count III). The parties dismissed

Count IV alleging that Defendants violated the Truth in Lending Act (docs. 29, 32).

II. <u>Conclusions of Law</u>

A. <u>Standard of Review</u>

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a) (Dec. 2010).  Defendants, as the parties seeking summary judgment bear "the

initial burden to show the district court, by reference to materials on file, that there are no

genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929

F.2d 604, 608 (11th Cir. 1991).  The party seeking summary judgment "always bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those

portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Clark,* 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986)).  In deciding whether Defendants have met their initial burden, the Court must review the record and draw all reasonable inferences therefrom in a light most favorable to the Moores, as the non-moving parties. *See Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1313 (11th Cir. 1999).

Once Defendants have satisfied this responsibility, the burden shifts to the Moores, as the non-movants, to show the existence of a genuine issue of material fact that would preclude summary judgment. *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). "In reviewing whether the [Moores have met their] burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505 (1986) ((bracketed text added). However, Defendants would be entitled to summary judgment if the Moores fail "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof.'" *In re Walker*, 48 F. 3d 1161, 1163 (11th Cir. 1995) (quoting *Celotex Corp.*, 477 U.S. at 323, 106 S. Ct. at 2552) (bracketed text added). Overall, the Court must "resolve all issues of material fact in favor of the [Moores], and then determine the legal question of whether [Defendants are] entitled to judgment as a matter of law under that version of the facts." *McDowell v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004) (citing *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003)) (bracketed text added).

However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).  "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (citation omitted).

B. <u>Analysis</u>

1. <u>Count One - Breach of the Mortgage and Note</u>

In their complaint, the Moores allege that Defendants Seterus and FNMA breached the terms of the Mortgage and Note because they failed to apply payments tendered by the Moores in accordance with the Note and Mortgage and by demanding sums not owed (doc. 1, p. 8) [15]

Defendants argue that there was no breach because all items comprising the amount demanded in the April 2015 demand letter were authorized by the Mortgage and Note and due at that time.  They point out that the Mortgage and Note authorize the collection of loan installments, legal fees, property inspection fees, late fees, and charges in connection with a borrower's default. They assert that the fact that the Moores' "payment was *applied* toward

---

[15]  The Moores also alleged that Defendants had breached the implied duty of good faith and fair dealings.  However, as Defendants point out, the Mortgage and Note specify all duties and obligations, and therefore, the implied duty does not exist in this circumstance. *Bennett v. Nationstar Mortg., LLC*, 2015 WL 5294321, at *8 (S.D. Ala. Sept. 8, 2015).  Also, breach of this duty is not actionable unless the breach is tied to performance of a specific term of the contract, and in that circumstance, the proper cause of action is for breach of the terms of the contract, and not a separate claim or action for violation of the implied duty of good faith and fair dealing. *Id.* *See Federal Home Loan Mortg. Corp. v. Anchrum,* 2015 WL 2452775, at *8 (N.D. Ala. May 22, 2015) (implied covenant of good faith and fair dealing does not provide a separate cause of action).

future payments does not negate the fact that this amount was *owed* as of April 7, 2105" for past due loan installments, fees and expenses (doc. 33, p. 12) (emphasis in original).

Defendants also argue that the payments were applied according to the terms of the Mortgage and Note as set forth in the second paragraph of Section 2 of the Mortgage. Defendants point out that this paragraph applies when there are periodic payments outstanding and allows the lender to apply the payments received, first to past due periodic payments and, because more than one periodic payment was outstanding, second to future payments, and last to any late charges due. Defendants state that their policy is to apply loan payments first to unpaid delinquent loan installments, with any remaining funds applied toward up to two future installments, then to late fees, and last to other charges. This policy appears to benefit customers because Defendants cannot foreclose based on unpaid expenses and fees, but may foreclose upon unpaid loan installments. Overall, Defendants argue that the Moores have no evidence that Seterus misapplied the payments demanded in April 2015, or any evidence to contradict the validity of the fees and charges included in the amount demanded.

The Moores respond that neither the Mortgage nor the Note authorize double collection of an amount owed and that by demanding and collecting sums already paid, Defendants breached the terms of the Mortgage and Note. The Moores argue that the "facts clearly show that at least some of the amounts collected in the bankruptcy and demanded in the April 7th demand letter had already been paid either directly to Suntrust or through the bankruptcy plan." (Doc. 38, p. 29) In support, the Moores point out that there are "prepetition charges (relating to the foreclosure) which exactly match those items listed in the Proof of Claim" (doc. 38, p. 8) (*Cf.,* Proof of Claim showing a claim of $200.00 for title search, $540.00 for attorney fees for the foreclosure, $206.54 for publication and $5.59 in postage for a total of $952.13 with the

17

Screenshot showing the unpaid fees and expenses included in the April 2015 demand letter -

$5.59, $206.54, $360.00, $200.00, and $180.00 totaling $952.13) (docs. 38-7, 38-13).  The

Moores also point out that they paid the legal fees for Seterus' post-petition motion for relief

from automatic stay in April 2013,[16] but the Screenshot includes these same legal fees.

Therefore, the Moores argue that Seterus improperly demanded these legal fees again in April

2015.[17] [18]

The Moores also argue that Defendants' method of applying payments conflicts with

paragraph 2 of the Mortgage, which describes how the payments must be applied (doc. 38, p.

11). They assert that by applying payments first to payments and then to expense, Defendants

have breached the terms of the Mortgage.

The Moores are correct that pre-petition fees and expenses were included in the April

2015 demand letter. However, the funds received from the Moores in May 2015 – $14,331.71 –

---

[16]  Seterus sought fees and expenses totaling $826.00.  Bankruptcy Court Judge Shulman awarded $726.00, and the Moores paid $726.00.

[17]  The Moores assert that the "screenshot also includes a host of other fees which pre-date the [Motion for Relief from Stay], or exactly match the amounts sought in the [Motion]" (doc. 38, p. 9, 29-30).  They assert that there is a "strong inference" that these "other fees" were the "same as those paid in the bankruptcy" (Id.). They argue that because these fees were "incurred post-petition and before the conditional denial order" entered by Bankruptcy Judge Shulman, these fees "were likely included in the amount awarded" in the conditional denial order. (Id.)

The Court disagrees.  Review of the Fact Summary attached to the Motion for Relief from Stay indicates that there were no "other fees" requested (See doc. 38-10, p. 6, showing the attorney fees and costs for the Motion as the only "Other Charges & Costs" itemized). The remainder of the sums paid by the Moores pursuant to the conditional denial order were for their past due mortgage payments, but not for other fees or expenses.

[18]  The Moores also argue that their "unapplied payments to Suntrust" were included in the April 2015 demand letter (doc. 38, p. 9).  The Court has reviewed the Activity Statement provided by Seterus and finds that the four payments at issue have been credited to the Moores account (*see supra*, Findings of Fact).

were applied only to payments and late fees –

> On May 7, 2015, we received funds in the amount of $14,331.71 to reinstate the loan to a contractually current status. These funds were combined with the funds of $126.69 in the suspense account to satisfy the October 1, 2014 through June 1, 2015 contractual installments of $1,476.81 each (totaling $13,291.29) and the remaining funds of $1,167.11 satisfied the late fees assessed to the loan. These funds were not applied to satisfy any of the legal fees assessed to the loan that were included in the total amount detailed on the notices issued to you on April 7, 2015. We apologize for any confusion this may have caused.

(Doc. 33-1, p. 88, Seterus' August 2015 letter).

The Moores have failed to present evidence to dispute the fact that the payment Seterus received from the Bankruptcy Plan in 2012 was not applied to fees and expense, but instead applied only to loan payments (*See* attached Summary Chart of Plaintiffs' evidence). Thus, the fees and expenses remained unpaid at the time that Seterus made the demand for payment in April 2015 and again in September 2015.  The Moores' payments have not been applied twice to the same fees and expenses but instead, their payments have never been applied to fees and expenses (but for late fees).[19]

In support of their argument that they have authority under the Mortgage to apply the payments to loan installments instead of fees and expenses, Seterus and FNMA cite to the second paragraph of section 2 of the Mortgage.  The Moores have cited the first paragraph in support of their argument that the payments were improperly applied.  The section sets forth as follows:

> 2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under

---

[19] The Activity Statement indicates that these funds were paid and placed in a "suspense deposit" (doc. 38-18, p. 9). It appears that the $726.00 paid specifically for attorney fees and costs was placed in a "suspense deposit"(doc. 38-18, p. 9) It appears that these funds were applied to the July 7, 2014 payment as part of a payment taken from the suspense account. (Id.).

the Note; (c) amounts due under Section 3. ["Funds for Escrow Items"] Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

(Doc. 33-1, p. 16) (bracketed text added).

The Moores argument is misplaced. The method of application of a "delinquent Periodic Payment" such as the Moores is addressed in the second paragraph.  However, the Court disagrees with Defendants interpretation of the paragraph as support for paying up to two future payments.  The section states that "[i]f more than one Periodic Payment is outstanding" as has been the case with the Moores, then the "Lender may apply any payment received from Borrower to the *repayment* of the Periodic Payments" (Id.) (emphasis added).  A plain reading of the paragraph does not indicate any authorization to apply the payment to a future Periodic Payment.  But there is also no prohibition.

Defendants rely upon the next sentence – "To the extent any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due" (Id.) – as authority for application of funds to up to two future

periodic payments.[20]  However, reading the sentence in context of the entire paragraph, "Periodic

Payments" means outstanding or delinquent Periodic Payments", not future periodic payments,

which have not yet become due.  The paragraph begins "If Lender receives a payment from

Borrower for a delinquent Periodic Payment . . ." (Id.).  The next sentence begins "If more than

one Periodic Payment is outstanding…" and requires the lender to apply the payment to the

"repayment of Periodic Payments" – in the plural, thus contemplating that one or more

outstanding or delinquent payments may be repaid from the borrowers' payment. *3455, LLC v.*

*ND Properties, Inc.,* 631 Fed. Appx. 701, 709 (11th Cir. 2015) ("Under general rules of contract

interpretation, a specific provision prevails over a broader one.")  The Mortgage did not address

the application of excess to future payments, instead of to outstanding fees.

"The elements of a breach of contract claim under Alabama law are: (1) a valid contract

binding the parties;[21] (2) the plaintiff's performance under the contract; (3) the defendant's

nonperformance; and (4) resulting damages." *Barrett v. Radjabi–Mougadam*, 39 So.3d 95, 98

(Ala.2009) (quotations and citations omitted).  Assuming for purpose of this motion, that the first

three elements are met, the Moores must show that there is a dispute of fact that they have been

damaged by the method of application or by the alleged demand for payment of fees and

expenses that they previously paid but were applied to their past due monthly payments.

The Moores argue that they have suffered actual and emotional damages because

Defendants, specifically Seterus, demanded sums that had already been paid, then applied those

---

[20]  "The May 2015 Periodic Payment was outstanding at the time the payment was made
and could be paid in full.  Likewise, the June 2015 future Periodic Payment could be paid in full"
(doc. 40, p. 13).

[21]  Generally, the note and mortgage constitute a valid and binding contract. *See NuGen
Intern., Inc. v. Kennedy,* 2012 WL 1569572, 3 (N.D. Ala. 2012).

sums to past due payments, which continuously left fees and expenses due.[22] However, as explained *supra*, the uncontradicted evidence indicates that the sums were owed. And, the Moores have failed to provide sufficient evidence of any damages that resulted based on simply the way Seterus applied the payments.  Accordingly, summary judgment is granted in favor of Defendants as to this claim.

2. Count Two - The Moores' RESPA claim[23]

The Moores allege that Seterus violated 12 U.S.C. § 2605(e) which sets forth the duties of a loan servicer to a respond to a borrowers' inquires.  Specifically, they allege that Seterus failed to properly respond to their QWR/NSE, failed to make appropriate corrections, failed to conduct any reasonable investigation of the errors described in the QWR/NSE, failed to refund monies wrongfully collected, and reported false and derogatory information to consumer reporting agencies after receipt of the QWR/NSE (doc. 1, p. 10). The Moores also allege that Seterus violated 12 U.S.C. § 2605(k) by failing to take timely action to respond to the QWR/NSE and failing to comply with the requirements of Regulation X regarding the response and conduct of an investigation of servicing errors and correcting errors (doc. 1, p. 10-11).

Seterus argues that it timely and reasonably responded to the QWR/NSE, and that its response addressed each of the Moores' eight questions therein. Seterus also points out that it did

---

[22] For example, the Moores state that "acting under the belief that their home would be foreclosed (without further notice), [they] scrambled to sell personal items at a price below which they could have received without the urgency. This was proximately caused by Seterus' wrongful attempt to collect sums already paid" (doc. 38, p. 27).  However, at that time, the Moores were past due for seven monthly payments - October 2014 through April 2015 - totaling $10,337.61. They also owed late charges of $1,537.60, and property inspection fees of $180.00 (doc. 33-1, p. 5, Foster Affidavit).   Defendants were also attempting to collect a debt that the Moores actually owed.

[23]  The Moores abandoned any claim for RESPA statutory damages under 12 U.S.C. § 2650(f)(B) (doc. 38, p. 24, n. 15).

not report the loan to any credit bureau after it received the QWR/NSE and that it has not reported the loan to any consumer-reporting agency since September 2012.  Assuming that the response was insufficient, Seterus argues that the Moores have failed to present any evidence of actual damages – pecuniary or emotional distress – that resulted from the alleged failure to respond. Seterus points out that the emotional distress and mental anguish appear related to Seterus' actions in servicing the loan generally and the Moores' attempt to avoid foreclosure, but not as a result of the response to the QWR/NSE.

The Moores did not respond to any of Seterus' arguments in defense of the RESPA claim except to argue that Seterus failed to conduct a reasonable review of its own documents and that there was evidence of actual damages (doc. 38, p. 12-13, 23-26).  Accordingly, the Moores are deemed to have abandoned their remaining RESPA claims. *See Clark v. City of Atlanta*, 544 Fed.Appx. 848, 855 (11th Cir. 2013) ("We, however, agree with the district court's determination that in failing to respond to the defendants' arguments, Mr. and Ms. Clark abandoned their excessive force and state law claims. 'In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.' *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir.1995) (citation and internal quotation marks omitted). 'As such, [t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.' *Id*. (citation omitted). Instead, 'the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.' *Id.* (citations omitted)."). [24]

The Moores argue that the Contested Litigation Officer Foster's "testimony establishes

---

[24] In their response, the Moores specifically abandoned any claim for RESPA statutory damages under 12 U.S.C. § 2605(f)(B) (doc. 38, p. 24).

conclusively that a reasonable review of Seterus own documents would have revealed that it has over-collected amounts due" (doc. 38, p.2 6).  They also argue that if Foster had compared the "screenshot detailing the components of the April 7th demand amount" with the "items sought and collected in the bankruptcy", Seterus would have discovered that the "demand included sums already paid." (Id.).[25]

The Consumer Financial Protection Bureau promulgated new regulations that clarify the loan servicers' obligations upon receipt of a QWR/NSE, as follows:

(e) Response to notice of error.

(1) Investigation and response requirements.

> (i) In general. Except as provided in paragraphs (f) and (g) of this section, a servicer must respond to a notice of error by either:

> (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

> (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35(e)(1)(i) (emphasis added).

---

[25] The Moores also argue that a reasonable investigation would have revealed that at least two of their four early 2012 payments to Suntrust were not applied to their account.  However, the Court has been able to trace the application of these payments and ascertain that the four payments were applied to the Moores' account (*See supra,* Findings of Fact).

Seterus selected option (b).  Therefore, it has two duties – to conduct a reasonable investigation, and to provide a written notification. *Id.*  The response to the QWR/NSE was prepared by a member of the Correspondence Response Team and addressed each of the eight items in the Moores' QWR/NSE. Relevant to the Moores' argument, the reviewer explained that the amount detailed in the April 2015 Notice of Intent to Foreclose included "any fees that had been assessed to the loan at that time" (doc. 38-18, p. 2).  However, the reviewer also explained that the funds received were applied to loan payments and late fees, but "were not applied to satisfy any of the legal fees assessed to the loan that were included in the total amount detailed on the notice issued" to the Moores. In other words, the reviewer explained that none of the funds collected in April 2015 were applied to the pre-petition and post-petition fees and expenses that the Moores believed had already been paid.  Instead, the funds collected were applied to the Moores' delinquent monthly payments, which they were obligated to pay according to the terms of their Mortgage and Note, including the disputed June 2015 payment.  There is insufficient evidence that this information is incorrect, as alleged by the Moores. Rather the evidence supports this summary as correct.

Moreover, the Moores have not presented any evidence that Seterus' alleged failure to reasonably investigate the items in their QWR/NSE caused their damages.[26] *See Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1245-1246 (11th Cir. 2016) ("RESPA states that actual damages arise 'as a result of' the servicer's alleged violation. . . . This language suggests there must be a 'causal link' between the alleged violation and the damages.") (citing 12 U.S.C. §

---

[26] The Moores argue that they were forced to pays sums that they had already paid, that they had to scramble to sell personal items to pay these sums, and that this was caused by Seterus' "wrongful attempt to collect sums already paid" (doc. 38, p. 27).  These alleged damages appear at best to be the result of the demand letters sent by Seterus and not a result of Seterus' response to the QWR/NSE. (*But see,* discussion *supra.*)

2605(f)(1)(A) and comparing *Turner v. Beneficial Corp.*, 242 F.3d 1023, 1028 (11th Cir.2001) (en banc) wherein the Eleventh Circuit interpreted a similarly phrased damages provision in a consumer protection statute).  The Moores argue that "any reasonable investigation would have revealed that a refund was due or credit was owed" and that "[f]ailure to issue that refund or credit is damage" (doc. 38, p. 27).  However, the reviewer discovered that surplus funds had been collected for the escrow and that $6,256.06 had been refunded to the Moores in late June after receipt of their QWR/NSE (doc. 38-18, p. 2). *See Renfroe,* 822 F. 3d at 1246 (explaining that "a notice of error triggers present RESPA obligations with respect to past error.") (citing 12 U.S.C. § 2605(e) ("creating a '[d]uty of loan service to respond to borrower inquiries,' including by crediting erroneous charges.").  That the Moores disagree with how their payments were applied to their loan does not make the application of payments an error that Seterus should have discovered when it conducted the review.  Accordingly, summary judgment is granted in favor of Defendant Seterus as to this claim.

### 3. Count Three - The Moores' claims under the FDCPA

The Moores allege that Seterus violated the FDCPA while attempting to collect their debt and that the violations include, but are not limited to, the following:

> A. Attempting to collect amounts which are not authorized by any contract or permitted by law. This is a violation of 15 U.S.C. § 1692f(1);
>
> B. Attempting to collect a debt by use of false, deceptive and/or misleading statements aimed at coercing the Plaintiffs to pay the debt in violation of 15 U.S.C. § 1692e; …
>
> D. Taking or threatening to take non-judicial foreclosure action without any legal right to do so. This is a violation of 15 U.S.C. 1692f(6).

(Doc. 1, p. 12).[27]

Congress enacted the FDCPA "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).  The FDCPA prohibits a "debt collector" from using a "false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e.

To succeed on an FDCPA claim, the Moores must prove (1) that they have been the object of collection activity arising from a consumer debt; (2) that Defendant Seterus is a "debt collector" as defined by the FDCPA; and (3) that Defendant Seterus has engaged in an act or omission prohibited by the FDCPA. *Alvarado v. Credit Protection Ass'n, L.P.*, 2015 WL 1815863, at *3 (M.D. Fla. Apr. 22, 2015); *see Reese v. Ellis, Painter, Ratterre & Adams, LLC*, 678 F.3d 1211, 1216 (11th Cir. 2012).  To enforce the FDCPA's prohibitions, Congress provided consumer debtors with a private right of action against "debt collectors who violate the Act" and makes them "liable for actual damages, statutory damages up to $1,000, and reasonable attorney's fees and costs." *Owen v. I.C. Systems, Inc.,* 629 F.3d 1263, 1270 (11th Cir. 2011).

In relevant part, the FDCPA defines "debt collector" as follows:

(6) The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly

---

[27]  The Moores also alleged that Seterus violated 15 U.S.C. § 1692e(8) by communicating "to any person, including credit bureaus, credit information which is known or which should be known to be false…" (doc. 1, p. 12). The Moores specifically abandoned this claim in the response (doc. 38, p. 21, n.14).

or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6).

In relevant part, 15 U.S.C.§ 1692a(6)(F)(iii) provides an exclusion from the definition of debt collector, for "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person[.]"

As to the first element, Seterus argues that its "principal purpose" is not debt collection, but instead servicing mortgage loans, which includes more functions than debt collection. As to the second, Seterus argues that it does not regularly collect or attempt to collect debts owed or due to another.  Instead, Seterus asserts that it collects its own debts. Seterus argues that the right to collect the debt was transferred from FNMA to Seterus.  Therefore, it was not attempting to collect a debt owed to third party FNMA.

The Moores respond that Seterus is a debt collector because it acquired their loan while the loan was in default and therefore, 15 U.S.C. § 1692a(6)(F)(iii), excluding loan servicing companies who acquire a loan that is not in default, does not apply.  The Moores argue that the courts have uniformly held that the FDCPA applies to mortgage servicers when they acquire servicing of a loan in default. [28]  The Moores argue that there is no dispute of fact that FNMA owns their loan, and therefore, Seterus acquired only the right to collect the loan payments on behalf of FNMA. They argue that Seterus meets two prongs of the debt collector definition: "(1) that the defendant regularly collects debts owed or due another; and (2) that the debt was in

---

[28]  The Moores argue that the decision in *Davidson v. Capital One Bank (USA) N.A.*, 797 F. 3d 1309, 1314 (11th Cir. 2015), upon which Seterus relies, does not alter this well-established rule. Instead, the *Davidson* decision "merely confirms that 'debt collector status includes the requirement that [the defendant] regularly collects debt owed or due another'" (doc. 38, p. 16).

default when it was obtained" (Doc. 38, p. 16)

For purpose of this motion for summary judgment, the Court finds that there is no dispute of fact that Seterus meets the second prong of the FDCPA's definition of debt collector.  As to the first prong, although Seterus' principal purpose may not be debt collection, there is no dispute of fact that Seterus is a loan servicer and as part of its duties, collects or attempts to collect debts owed to another, *i.e.*, the lenders for which it services the loans. Seterus argues that it obtained the right to collect the debt from FNMA.  However, that does not alter the undisputed fact that FNMA is the lender to which the Moores' debt is owed.[29]

Seterus next argues that there is no evidence that it has violated 15 U.S.C. § 1692f(1) by collecting or attempting to collect any amounts that were not authorized by the Mortgage and Note or by law.  Seterus points out that the payments and fees included in the April 2015 letter were expressly authorized by the Mortgage and Note, and were due at the time of the letter.

The Moores respond that fees and expenses demanded and collected as a result of the April 2015 letter were also fees and expenses that had been included in the Proof of Claim and the Motion for Relief from Stay, both of which were paid in the bankruptcy.[30]  They argue that Seterus was not authorized to collect or demand payment of sums it had already received; and therefore, violated § 1692f(1).

---

[29]  Moreover, there is no dispute of fact that some or all of the statements and letters sent by Seterus to the Moores included this statement or a similar statement: "This communication is from a debt collector as we sometimes act as a debt collector.  We are attempting to collect a debt and any information obtained will be used for that purpose." (See, Doc. 38-12, April 2015 demand letter).  In this case, Seterus was acting a debt collector for FNMA.

[30]  The Moores also allege that Seterus sought to collect some of the four monthly payments that they had paid to Suntrust before Seterus acquired the account.  As stated previously, three of the four payments appear to have been applied to the Moores' account by Suntrust and Seterus applied the fourth payment after the transfer of servicing.

As stated herein, review of the Moores' Activity Statement shows that Seterus applied the payment from Bankruptcy Court for the Proof of Claim to nine specific monthly mortgage payments, but not to any fees or expenses that were itemized in the Proof of Claim (doc. 38-18, p. 9), thus the itemized fees were still owed when demanded.  Also, as stated herein, the Fact Summary for the Motion for Relief from Stay indicates that the only fees or expenses claimed were those for preparation and filing of the Motion.  Pursuant to the Bankruptcy Court's order, the Moores paid $726.00 for those fees and expenses.  That sum was placed in the Moores' suspense account and appears to have been applied to the July 7, 2014 monthly mortgage payment (doc. 38-18, p. 9).  The Moores have provided no evidence otherwise, but rather continue to rely upon their conclusory statements that they didn't owe as much as Defendants claimed and that these fees and expenses had been paid.  They also rely upon Seterus' Litigation Officer's testimony that he "could not be sure one way or the other, whether these items were the same as those paid in the bankruptcy" to argue that "the record presents a strong inference that they were." (Doc. 38, p. 9) This is not sufficient to create an issue of material fact for the jury to resolve.

The fees and expenses included in the April 2015 letter remained due because Seterus applied the payments made to the delinquent monthly mortgage payments.   This method of application is authorized by the terms of paragraph 2 of the Mortgage, which provides for application of payments first to the delinquent monthly payments and last to late charges (doc. 33-1, p. 16).

Moreover, these fees and expenses were authorized by the terms of the Mortgage.   As previously stated, the Mortgage and Note authorize collection of loan installments, late charges, and attorney's fees  (doc. 33-1, p. 9-10, Note; p. 16, 19-20, Mortgage, ¶¶ 1, 9). Paragraph 14 of

the Mortgage specifically authorizes charges "for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection fees and valuation fees" (doc. 33-1, p. 22).  Paragraph 14 also states: "In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee." (Id.)  Although the Moores argue that Seterus violated the FDCPA by attempting to collect sums they had already paid, there is no dispute of fact that the sums the Moores had paid were applied to their delinquent mortgage payments, instead of to fees and expenses.  Therefore, the fees and expenses included in the April 2015 letter were due.  Accordingly, Seterus is entitled to summary judgment as to this claim.

Seterus next argues that there is no evidence that it made false or misleading statements in the April 2015 demand letter to coerce the Moores to pay their debt in violation of 15 U.S.C. § 1692e.  Seterus asserts that the letter provided the requisite 30-day notice prior to acceleration as required by the Mortgage and Note. The letter also provided notice that if the default was not cured, the lender may require immediate payment of all sums without further demand and may invoke the power of sale or other remedies.  Seterus argues that because the letter met the requirements of the Mortgage, it had the right to accelerate the loan and begin foreclosure proceedings without further notice if the default was not cured.  Seterus further asserts that the letter did not state that a foreclosure sale would occur without further notice, but instead stated that Seterus may commence foreclosure proceedings without further notice.  Seterus also points out that the letter included pre-acceleration notice and also informed the Moores as to their right to reinstate after acceleration.

The Moores respond that the April 2015 letter contained two misrepresentations – an "overinflated amount demanded" and a "false statement that foreclosure would take place if the amount was not paid 'without further notice'" (doc. 38, p. 22).  They argue that Seterus' representations were false, deceptive, or misleading or otherwise violated the FDCPA because the least sophisticated consumer would have thought that the amount due $14,331.71, was the actual amount to bring the loan current, but instead it included items, *i.e.,* fees and expenses, that had been paid.  They also argue that the least sophisticated consumer would have believed that Seterus was authorized to collect that amount, and that if it was not paid, a "foreclosure sale would occur 'without further notice'" (doc. 38, p. 23).

As previously discussed, the amount demanded in the April 2015 letter did not include a demand for payment for any fees and expenses as to which Seterus had applied any prior payment.  Therefore, there is no dispute of fact that the demand for those fees and expenses did not inflate the amount owed.

As to whether the April 2015 letter contained false or misleading representations, the Moores also responded that "among the examples" of violations of § 1692e are "'[t]he false representation of the character, amount, or legal status of any debt'" and "'[t]he threat to take any action that cannot legally be taken or that is not intended to be taken.'" 15 U.S.C. 1692e(2)(A) & (5)." (Doc. 38, p. 22)  Each of these subsections of the FDCPA hase developed a specific body of law.  For example, the case law interpreting whether a "threat to take" legal action exists, generally presupposes that the letter sent to the consumer has actually threatened legal action, such as filing suit or turning the matter over to an attorney.  *See LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1193 (11th Cir. 2010).  The Eleventh Circuit explained that

> [m]ore specifically, within the non-exhaustive list of potential violations of Section
> 1692e, Subsection 1692e (5) prohibits a debt collector from "threatening to take

action that cannot legally be taken or that is not intended to be taken." 15 U.S.C. §
1692e(5). . . . The next issue then is whether, under the FDCPA, Unifund's
dunning letter constitutes a threat to take action which could not legally be taken—
namely, to commence legal proceedings. Our framework for analysis is two-fold.
First, we consider whether the language of the letter constitutes a threat for
purposes of § 1692e(5). … If so, we consider whether the action threatened is one
which could be legally taken.

*LeBlance,* 601 F. 3d at 1193 (footnotes omitted).   Obviously, a violation of § 1692e(5) requires

a much more extensive analysis than the Moores have provided the Court.

Therefore, the Court is not inclined to sift through the "evidence already described" or

the "same evidence" relied upon to argue that the April 2015 letter violated the general provision

of § 1692e – false or misleading representations in connection with the collection of a debt -  as

suggested by the Moores (doc. 38, p. 22-23), to ascertain what evidence therein would support

their argument that Seterus violated § 1692e(2)(A) and (5) of the FDCPA.  *See Clark*, 544 Fed.

Appx. at 855 ("In opposing a motion for summary judgment, a party may not rely on his

pleadings to avoid judgment against him. …. As such, [t]here is no burden upon the district court

to distill every potential argument that could be made based upon the materials before it on

summary judgment.'" … 'the onus is upon the parties to formulate arguments") (citations and

internal quotations omitted).

As to whether the April 2015 letter contained false, deceptive, or misleading statements

to collect the debt, 15 U.S.C. § 1692e, the Eleventh Circuit has applied the "least sophisticated

consumer" standard. *Jeter v. Credit Bureau, Inc.,* 760 F. 2d 1168, 1172  (11th Cir. 1985). In that

regard, "[b]ecause Congress enacted the statute primarily to protect consumers", the courts must

"evaluate the circumstances giving rise to an alleged FDCPA violation from the perspective of

the least sophisticated consumer."  *Prescott v. Seterus, Inc*., 635 Fed. Appx. 640, 644 (11th Cir.

2015) (citations omitted). "The least sophisticated consumer 'possess[es] a rudimentary amount

of information about the world and a willingness to read a collection notice with some care.'" *Id.*

(citations omitted).  "That standard protects 'naïve consumers' and 'prevents liability for bizarre

or idiosyncratic interpretations of collections notices by preserving a quotient of

reasonableness.'" *Id.* (citations omitted).

In relevant part, the April 2015 letter stated as follows:

IF THE DEFAULT IS NOT CURED ON OR BEFORE THE EXPIRATION
DATE, THE LOAN OWNER AND WE INTEND TO ENFORCE THE LOAN
OWNER'S RIGHTS AND REMEDIES AND MAY PROCEED WITHOUT
FURTHER NOTICE TO COMMENCE FORECLOSURE PROCEEDINGS.
FORECLOSURE PROCEEDINGS WILL NOT BE COMMENCED UNLESS
AND UNTIL ALLOWED BY APPLICABLE LAW. ADDITIONAL FEES
SUCH AS FORECLOSURE COSTS AND LEGAL FEES MAY BE ADDED
PURSUANT TO THE TERMS OF THE LOAN DOCUMENTS.

(Doc. 38-12) (font in original).

The parties arrive at different interpretations as to the meaning of the first sentence of

this paragraph.  The Moores "interpreted this to mean that there would be an immediate sale if

they did not pay without any further notice" (doc. 38, p. 23).  Seterus interprets this sentence to

mean that it may not give further notice before commencing foreclosure proceedings, but the

Moores would receive notice of the foreclosure proceedings when they commenced.  Applying

the standard of the "least sophisticated consumer", the Court finds that the paragraph in the April

2015 letter, taken as a whole, does not contain false or misleading statements.  Parsing the above

paragraph, the first sentence indicates that Seterus "may proceed without further notice to

commence foreclosure proceedings" and the next sentence states "Foreclosure proceedings will

not be commenced unless and until allowed by applicable law." *Id.*  From this, no reasonable

jury, applying the least sophisticated consumer standard, could find that the Moores would not

receive any further notice of foreclosure before the sale of their home.  Such an interpretation

defies the plain language of the notice.

Seterus also argues that there is no evidence that it threatened to foreclose without the right to do so in violation of 15 U.S.C. § 1692(f)(6).  Seterus points out that the loan was due for the October 2014 payment when the letter was sent in April 2015 letter.  Seterus argues that the Note provides that failure to make a full payment when due would result in a default and that the Mortgage provides for acceleration of the loan and sale of the property upon default.

The Moores respond that the same evidence that supports a violation of § 1692(e), which prohibits false or misleading representations by a debt collector, also supports a violation of § 1692(f), "which prohibits the threat of a non-judicial foreclosure action without authority or intent to take possession of the property"[31] (doc. 38, p. 23).

Regardless of whether a demand for payment for fees and expenses was included in the April 2015 letter, there is no dispute of fact that the Moores were in default when the April 2015 letter was sent.  They had not made a payment since September 2014.  They were seven months behind on their mortgage payments.  Shelley Moore admitted that they were behind in their payments although she disagreed with the number of months (doc. 33-2, p. 64, Shelley Moore Depo).  The Note provides as follows: "If I do not pay the full amount of each monthly payment on the date it is due, I will be in default" (doc. 33-1, p. 10).  The terms of the Mortgage authorize Seterus to take certain actions, including notice to the Moores regarding cure of the default and acceleration, when default has occurred (doc. 33-1, p. 25).  To the extent that the Moores may assert that Seterus lacked authority to foreclose because the April 2015 letter violated the FDCPA and consequently the Moores did not receive the notice as provided in the Mortgage, as

---

[31] In the complaint, the Moores alleged that Seterus violated the FDCPA by "[t]aking or threatening to take non-judicial foreclosure action without any legal right to do so" (doc. 1, p. 12).

stated above, there is no merit to that position.  Accordingly, Seterus is entitled to summary judgment as to this claim.

III. <u>Conclusion</u>.

Upon consideration, and for the reasons set forth herein, the Court finds that Defendants are entitled to judgment as a matter of law as to the Moores' claims. *See McDowell v. Brown,* 392 F.3d 1283, 1288 (11th Cir. 2004) (having resolved all issues of material fact in favor of the non-movant, the court must "then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts.") (citation omitted). Accordingly, Defendants' motion for summary judgment is **GRANTED.**

Judgment shall be entered by separate document as provided in Rule 58 of the Federal Rules of Civil Procedure.

DONE and ORDERED this the 16th day of December 2016.

s/ Kristi K. DuBose
KRISTI K. DuBOSE
UNITED STATES DISTRICT JUDGE